UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Nº 04 Civ. 5134 (RJS)
_____

LISA M. FITZPATRICK,

Plaintiff,

VERSUS

BAYER CORPORATION, AND BROADSPIRE NATIONAL SERVICES, INC., F/K/A KEMPER NATIONAL SERVICES,

Defendants.

_____

MEMORANDUM AND ORDER
January 17, 2008
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff Lisa M. Fitzpatrick brings this action against Bayer Corporation ("Bayer") and Broadspire National Services, Inc., formerly known as Kemper National Services ("Kemper") (collectively "Defendants"), seeking to reinstate long term disability ("LTD") benefits and to recover past benefits allegedly owed to her under the terms of the Bayer Disability Plans.[1]  Plaintiff alleges that Defendants arbitrarily and capriciously denied her claim in violation of Section 502 of the Employer Retirement Income Security Act of 1974 ("ERISA").[2]  The parties now cross-

---

[1] This case was previously assigned to the Honorable Richard Conway Casey, District Judge. The case was later reassigned, first to the Honorable Kenneth M. Karas, District Judge, on May 21, 2007, and subsequently to the undersigned on September 4, 2007.

[2] The complaint alleges that the action is brought "pursuant to section 502 et al., of ERISA." (Compl. ¶ 2.) However, Plaintiff fails to cite any specific provisions of ERISA under which her claim arises. Because Plaintiff seeks to recover benefits allegedly due to her under the terms of the Plan (as defined below), the Court construes her claim as one for a

move for summary judgment. For the reasons that follow, Plaintiff's motion is DENIED and Defendants' motion is GRANTED.

I. BACKGROUND

A. The Bayer Plan

Plaintiff began working at Miles, Inc. (a predecessor of Bayer) on May 23, 1988, as a secretary. (Defs.' 56.1 ¶ 1.)[3] Bayer offered an employee welfare benefit plan governed by ERISA called the Bayer Corporation Disability Plans (the "Plan"). (Defs.' 56.1 ¶ 3.) The Plan provided LTD benefits to qualifying employees. (*Id.* ¶ 4.) The benefits are paid out of a trust funded by contributions from Bayer and participant salary reductions, and the money held in that dedicated trust is used exclusively for the payment of Plan expenses and benefits. (*Id.* ¶ 5.)

The Plan identifies Bayer as the Plan Administrator, and grants to Bayer the exclusive discretionary authority to make eligibility determinations under the Plan. (*Id.* ¶ 6.) Specifically, the Plan states that Bayer

> shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plans including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plans. [Bayer] shall have the exclusive discretionary right to interpret the terms and provisions of the Plans and to determine any and all questions arising under the Plans or in connection with the administration thereof, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies or omissions, by general rule or particular decision . . . .

(*Id.* ¶ 7.) Bayer has assigned the authority to make final benefits eligibility determinations to the Bayer Benefits Administration Committee (the "Committee") (*Id.* ¶ 6), while Kemper has been retained to oversee the day-to-day administration of claims. (*Id.* ¶ 10.) Kemper is responsible for making initial claim benefit determinations under the Plan. (*Id.* ¶ 11.) However, pursuant to the Service Agreement between Bayer and Kemper, the ultimate authority to make final eligibility determinations and interpret Plan provisions remains with the Committee. (*Id.* ¶¶ 10-12.)

Under the Plan, qualified employees are eligible for short-term and long-term disability benefits, provided that the employee meets the criteria outlined by the Plan. (*Id.* ¶ 8.) The Plan informs employees that, in order to initially qualify for LTD benefits,

> you must be unable to perform the essential duties of your regular occupation. You must provide the company and claims administrator periodically with proof of your disability and your disability will need to be medically verified. The claims administrator may ask you to be examined by an independent doctor to verify your continuing disability.

(*Id.*) After six months of receiving LTD benefits, the Plan requires that the employee

---

recovery of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

[3] Where only one party's 56.1 Statement is cited, the facts are taken from that party's statement, and the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

2

be "totally disabled" in order to continue to be eligible for LTD benefits. (*Id.*) In order to be considered "totally disabled" the employee must be "unable to work at any job for which [he or she is] or could become qualified by education, training or experience." (*Id.*) The Plan further provides that benefits will cease automatically if, among other things, the employee is deemed to be no longer disabled, is no longer under the care of a physician, fails to "provide satisfactory proof of [his or her] continuing disability" or refuses to be examined by a Plan doctor. (*Id.* ¶ 9; *see also* Zimmerman Decl. ¶ 2(C), Ex. C at 511.)

B. Plaintiff's Claim for LTD Benefits

On or about February 22, 1993, Plaintiff ceased working at Bayer, citing Chronic Fatigue Syndrome ("CFS") as the reason for her departure. (Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 1.) She returned briefly on March 22, 1993 before leaving again on April 8, 1993. (Defs.' 56.1 ¶ 2.) She returned to Bayer to work half-days beginning on May 24, 1993, but stopped working completely after July 28, 1993. (*Id.*) During the periods of time that she was not working, Plaintiff received short-term disability benefits pursuant to the Plan. (*Id.*)

On September 1, 1993, Plaintiff applied for LTD benefits pursuant to the Plan, listing CFS as the reason for her disability and identifying Dr. Susan Levine, M.D., as her treating physician. (Defs.' 56.1 ¶ 13.) Dr. Levine completed forms in conjunction with the application in which she cited CFS as the reason for Plaintiff's disability. (Zimmerman Decl. ¶ 2(A), Ex. A ("Administrative Record" or "AR") at 209-10.) She noted that, in an eight-hour work day, Plaintiff could sit for one hour, but not stand or walk, and suffered from "severe fatigue." (*Id.*) She further noted that Plaintiff could not bend, squat, crawl, climb, or reach above shoulder level, could not carry any weight, and could not use her feet or hands for repetitive movements. (*Id.* at 210.)

On October 7, 1993, Northwestern National Life ("Northwestern"), Bayer's prior claims administrator, sent Plaintiff a letter informing her that her application for LTD benefits had been approved, and that the first payment would be made on October 12, 1993. (Defs.' 56.1 ¶ 15.) Plaintiff was awarded a gross monthly benefit of $1,518.40, or 60% of her pre-disability salary, subject to reduction due to the receipt of any other benefits, including social security benefits. (*Id.*) On October 7, Northwestern also sent a letter to Dr. Levine asking her to submit additional information on Plaintiff's condition, including her current "diagnosis, treatment, and prognosis," and whether Plaintiff was "disabled from performing any 'gainful' occupation." (AR at 127.) Dr. Levine was also asked to submit Plaintiff's medical records for review. (*Id.*)

On October 27, 1993, Dr. Levine submitted a short letter to Northwestern, describing Plaintiff's prognosis as follows:

> Ms. Lisa Fitzpatrick remains under my care for the Chronic Fatigue Syndrome (CFS) and is receiving Kutapressin 1 cc daily (an antiviral); Restoril 30 mg at bedtime; and gammaglobulin 3 cc's weekly. Her prognosis is poor. She is unable to stand up; sit up; lift or carry packages; climb stairs; interact with others; speak on the phone; type; or perform

3

any of the duties of her present or any other occupation. She suffers from extreme exhaustion; muscle weakness; and cognitive abnormalities due to the CFS. I expect her disability to last an indeterminate period of time of at least 18 months to 2 years.

(*Id.* at 135).

After Plaintiff's application for LTD benefits was granted, Dr. Levine submitted two letters in 1994 in support of Plaintiff's claim in response to requests from Northwestern.[4] Thereafter, Bayer's claims administrator periodically contacted Plaintiff to request updated medical information, which Plaintiff submitted in the form of either an Attending Physician Statement of Disability or Proof of Continuance form, at least through September, 1999. (Defs.' 56.1 ¶ 18; *see, e.g.*, AR at 198, 213-22.)

C. Kemper's Review of Plaintiff's Claim

In May of 2001, Kemper, which had taken over as Bayer's claims administrator, discovered that Plaintiff's file contained "no current medical data" and that a "full update" was needed. (AR at 230.) Subsequently, on or about May 21, 2001, Kemper sent a letter to Plaintiff requesting that she complete an LTD Questionnaire and Physician Update Form. (*Id.* ¶ 19; *see also* AR at 251.)

On June 1, 2001, Plaintiff submitted those forms. (AR at 252-58.) In the questionnaire, Plaintiff listed CFS as well as an "immune deficiency" as the medical conditions disabling her from work. (*Id.* at 252.) Plaintiff indicated that she was on various medications and that she was visiting Dr. Levine every three weeks for check-ups and "intravenously provided minerals, vitamins, etc. whatever I am lacking." (*Id.*) In describing her daily activities, she wrote "drawing" "when my hands allow me to and concentration is with me." (*Id.*) She also wrote that she was able to read; dress and engage in routine hygiene without assistance most of the time; cook, do laundry, sweep and vacuum, garden, dust, and mop "when I can;" make beds "sometimes;" climb stairs when she has to; and walk, drive and watch TV "rarely." (*Id.*) When asked to describe how her activities were restricted, she wrote "my confusion, or lack of concentration enables

---

[4] At least two such letters are contained in the record. On January 14, 1994, in response to a request from Northwestern via letter of December 20, 1993 (AR at 124), Dr. Levine submitted a letter in which she stated that she had seen Plaintiff in her office on December 16, 1993, and that Plaintiff "had a red throat, diminished (3/5) muscle strength in all extremities; and a heart murmur." (AR at 134). She also noted that she had advised bed rest, and did not "anticipate a return to work for her in less than a year and would now say that it is 'indeterminate.'" (*Id.*) On December 18, 1994, in response to a letter from Northwestern dated November 3, 1994 (AR at 114), Dr. Levine sent another letter, indicating that she had seen Plaintiff on December 7, 1994, and that Plaintiff reported "severe exhaustion; sore throats; lymph node swelling; muscle and joint pain; muscle weakness; headaches; ear pain; shortness of breath; and insomnia." (*Id.* at 131.) She further reported that Plaintiff "had a red throat; bilaterally enlarged lymph nodes in the cervical area; 3/5 motor strength throughout; normal heart, lung, and abdominal exams; and evidence of muscle wasting in the Biceps, Triceps, and Quadriceps muscles." (*Id.*) She concluded that "[b]ased on her lack of improvement and continued episodes of extreme muscle weakness and pain, in addition to her inability to think clearly I deem her prognosis to be poor and don't anticipate a return to work for an indeterminate period of time." (*Id.*).

me to perform simple tasks routinely" and that "limbs, muscles, coordination, strength weaken whenever it wants, stopping me from starting and/or completing something I've started" though her condition was "never consistent." (*Id.*) Finally, Plaintiff stated that her husband and children provided assistance to her "whenever my energy level gives out" which was "daily," and she noted that at least once every twenty-four hours her family had to assist her, although this was "never consistent." (*Id.* at 255.)

On July 30, 2001, Kemper sent a letter to Dr. Levine indicating that the Plaintiff's claim for LTD benefits was under review and requesting that Dr. Levine promptly complete and submit a Physician's Statement, an Estimated Functional Capacities form, and submit copies of notes, reports, and diagnostic test results for the Plaintiff. (*Id*. at 259.) On September 26, 2001, Kemper sent a letter to Plaintiff indicating that they had not yet received the requested information from Dr. Levine, and reminding Plaintiff that "[i]t is ultimately your responsibility to provide ongoing proof of disability." (*Id.* at 260.)

On or about September 27, 2001, Dr. Levine completed the forms and submitted the medical records to Kemper. (*Id*. at 269-93.) In the Physician's Statement, Dr. Levine wrote that Plaintiff was suffering from CFS and fibromyalgia, characterized by "severe exhaustion; muscle and joint aches; sleep disturbances; cognitive problems." (*Id.* at 269.) She described the Plaintiff as homebound. (*Id.* at 270.) In the Estimated Capacities Evaluation, Dr. Levine indicated that the Plaintiff could sit for one hour each day, and stand or walk for only thirty minutes every day. (*Id*.) She also indicated that Plaintiff could perform only a few of the listed tasks on the Estimated Capacities Evaluation, and only occasionally at that. (*Id.* at 271-72.) Finally, Dr. Levine submitted Plaintiff's medical records, which indicated that she had made regular visits to Dr. Levine. (*Id.* at 273-93.)

Based on the response from Dr. Levine, Kemper enlisted Dr. Russell Superfine, M.D., a physician board-certified in internal medicine, to review the file. (Defs.' 56.1 ¶ 21.) In November of 2001, Dr. Superfine completed that review, determining that the information provided by the Plaintiff failed to support a finding of total disability. (AR at 296-99.) Specifically, after reviewing the Plaintiff's entire record, Dr. Superfine wrote:

> In summary, although the claimant has many subjective complaints as noted above, there are insufficient objective findings of functional impairment to preclude the claimant from performing the duties of any occupation. With respect to the claimant performing her duties as a senior secretary which would be considered between a sedentary to a light duty position, there are also no included objective findings in the included records to support disability in this position.

(*Id.* at 298.) Dr. Superfine noted that additional documentation could be relevant to the review of Plaintiff's claim, including "a current musculoskeletal examination,

neuropsychological and functional capacity evaluations."[5] (*Id.*)

On February 1, 2002, Kemper sent a letter to Plaintiff advising her that, based on the medical update from Dr. Levine, as well as the review conducted by Dr. Superfine, it was not clear why she was totally disabled from all occupations as defined in the Plan. (*See Id.* at 294.) The letter gave Plaintiff thirty days in which to submit any additional objective medical evidence, including the results of the evaluations recommended by Dr. Superfine (e.g., musculoskeletal, neuropsychological and/or functional capacity evaluations), that could assist Kemper in making a determination on her claim. (*Id.* at 295.) The letter also reminded Plaintiff that "[i]t is ultimately your responsibility to provide ongoing proof of disability." (*Id.*)

On February 14, 2002, Dr. Levine submitted another letter to Kemper stating that Plaintiff remained completely disabled from CFS and fibromyalgia. (*Id.* at 313-14.) She noted that "[d]ue to [Plaintiff's] extreme muscle pain and weakness she is unable to stand for more than a few minutes at a time; perform even minimal household tasks or read or write for more than a few minutes due to her cognitive problems." (*Id.* at 313.) Dr. Levine noted that she had experience in treating and studying CFS. (*Id.*) She also stated that while she did not believe that a functional capacity evaluation would provide an accurate measure of her abilities, she had referred Plaintiff to a neuropsychologist. (*Id.*) However, she was concerned that it might not be covered by Plaintiff's medical insurance, and asked if Kemper would cover the cost.[6] (*Id.*) Finally, Dr. Levine noted that "this patient is completely and totally disabled, probably permanently, and although there are not many objective markers to support this conclusion it is largely based on my expertise in this area." (*Id.* at 314.)

Following this submission, in March of 2002, Kemper secured another peer review, this time by Dr. Eric Rosenkrantz, M.D., a specialist in internal medicine. (*Id.* at 320-22; Defs.' 56.1 ¶ 26.) After a review of Plaintiff's records, Dr. Rosenkrantz concluded that "there is no clinical description, physical exam finding, laboratory tests or x-ray study which document a functional impairment precluding her functioning in any occupation at this time." (*Id.* at 322.) Like Dr. Superfine, Dr. Rosenkrantz further noted that "recent comprehensive neuropsychiatric testing and neuropsychological measurement" would be relevant to consideration of the case. (*Id.* at 321.)

During this time, Kemper also conducted a review of the employment opportunities in Plaintiff's area suited to her training and physical capabilities, assuming she was capable of light to sedentary activity. Kemper

---

[5] While a functional capacity evaluation was later conducted, see *infra*, there is nothing in the record indicating that musculoskeletal and neurophysical evaluations were ever performed, or that the results of such evaluations, if any, were ever submitted to the Committee.

[6] By letter of February 20, 2002, John Delaney, a disability claims examiner for Kemper, notified Dr. Levine that the Plan did not provide for payment of fees associated with a neuropsychologist's evaluation. (AR at 312.) He noted that "[u]ltimately, it is [Plaintiff's] responsibility to support her claim for benefits." (*Id.*)

first secured an employability assessment report, which concluded that there were a number of employment opportunities available to Plaintiff based on applicable geographic and wage ranges. (*Id.* at 302-08; Defs.' 56.1 ¶ 24.) On March 14, 2002, Kemper received the results of a requested Labor Market Survey, which indicated that there were five existing employment opportunities in the Plaintiff's area for which Plaintiff was "vocationally, educationally and physically qualified." (AR at 323-29.)

By letter dated March 21, 2002, Kemper notified Plaintiff that, after reviewing her file and the above-discussed materials, her LTD benefits would be terminated, effective March 31, 2002. (*Id.* at 334-36; Defs.' 56.1 ¶ 28.) Specifically, the letter noted, "[a]s there has been no additional satisfactory medical documentation submitted/received to support you being disabled from any occupation and there have been positions located within the Plan parameters, your LTD benefits are terminated . . . ." (AR at 335.) The letter notified Plaintiff of her right to appeal the decision to the Committee, and to bring a lawsuit pursuant to ERISA should the decision remain unchanged after the Committee's review. (*Id.* at 336.) The letter also informed Plaintiff of Dr. Rosenkrantz's review and requested that she "provide current medical documentation" to the Committee, as suggested by Dr. Rosenkrantz, including the results of "comprehensive neuropsychiatric testing" and "neuropsychological measurements" in order to assist in her appeal, should she decide to file one. (*Id.* at 336.) Plaintiff never provided this information to the Committee, and no new medical records were submitted in the time between the March 21 decision and the Committee's consideration of Plaintiff's claim. (*See* AR at 6.)

E.  Bayer's Review of Plaintiff's Appeal

Plaintiff submitted a letter dated May 6, 2002 requesting an appeal of the decision. (AR at 3.) Plaintiff did not submit any additional medical information with the letter; she did, however note that while Dr. Levine had suggested that she see a different doctor, she could not afford the cost of an initial visit, which she was told would cost at least $1,200. (*Id.*) There is nothing in the record to suggest that Plaintiff ever made such a visit or that she otherwise made any effort to provide additional medical proof of her continuing disability to the Committee.

After receiving Plaintiff's appeal letter, Bayer requested an independent medical evaluation of her file from Dr. Donald J. McGraw, M.D., M.P.H. (*Id.* at 79-81; Defs.' 56.1 ¶ 30.) Dr. McGraw is board-certified in Occupational Medicine. (Zimmerman Decl. ¶ 2(F), Ex. F.) On August 13, 2002, Dr. McGraw submitted a report containing his findings to Bayer. (AR at 79-81.) Dr. McGraw's findings were as follows:

> The diagnosis that has been entertained in the medical records from Ms. Fitzpatrick's personal physician, Dr. Susan Levine, is chronic fatigue syndrome and fibromyalgia. The basis for these diagnoses are almost entirely subjective and based upon complaints expressed by the patient and documented in the medical records of her treating physician, Dr. Levine. A record review reveals subjective

7

complaints and essentially normal clinical examinations throughout the duration of the records. There were some treatments instituted for intermittent sinusitis and headaches, but once again the basis for the diagnoses of chronic fatigue and fibromyalgia were subjective with no objective clinical basis for any significant medical condition . . . .

Nowhere is there a bona fide functional capacities evaluation, which would be acceptable as an objective clinical basis to determine an individual's ability to perform productive work duties at any level.

(*Id.* at 80). Dr. McGraw concluded,

it is my clinical impression that Ms. Fitzpatrick does not meet the criteria for total disability as per policy definition based on the enclosed documentation of Bayer's long term disability plan. On that basis, she is not totally disabled and is capable of performing the duties of a senior secretary or any other similar position of at least a sedentary to light basis. There is no objective clinical basis on which one could objectively determine that Ms. Fitzpatrick is not capable of working on at least that level.

(*Id.* at 80-81.)

The Committee reviewed Plaintiff's appeal at its meeting on September 11, 2002 and found that, in light of Dr. McGraw's report, "a functional capacity evaluation should be conducted." (*Id.* at 2; Defs.' 56.1 ¶ 32.) The Committee sent a letter to the Plaintiff on September 25, 2002, informing her that they would contact her to arrange the evaluation. (AR at 2.)

The functional capacity evaluation of Plaintiff ("FCE") was conducted on November 1, 2002 by Maria Pagano, MS, RD, CSCS, of Nutrition and Fitness Partners Forever. (AR at 423-42; Defs.' 56.1 ¶ 34.) The results of the FCE were documented in a 19-page report. (AR at 424-42.) Bayer provided Plaintiff with transportation to and from the FCE at Plaintiff's request. (*Id.* at 418-20; Defs.'s 56.1 ¶ 33.)

Upon her arrival at the FCE, Ms. Pagano noted that Plaintiff arrived on time and reported that she "slept the whole time in the car." (*Id*. at 427.) Ms. Pagano further noted that Plaintiff "reports she is having a 'bad day' = 8/10 on the fatigue scale. She is breathing heavy and her eyes are 'glassy' and puffy. Her right eye is tearing. She reports she has had an upper respiratory infection for 3 weeks. She is presently on Bioxin for the infection." (*Id.*)

After the evaluation, Ms. Pagano noted the following in the report:

The results of this evaluation suggest that Ms. Fitzpatrick gave an unreliable effort, of those completed, with 10 of 20 consistency measures within expected limits . . . . Subjective reports of fatigue were associated with objective signs such as loss of focus and concentration. Although, there is evidence of objective signs consistent with stated complaints, clinical

observations that are inconsistent with self-reports, casual observations outside evaluation and vague comments also suggest evidence of symptom magnification behavior. Overall, data suggests that the Evaluee was self limited due to reported fatigue and efforts were submaximal.

(*Id.* at 424.) Ms. Pagano noted that the demonstrated sitting tolerance was approximately forty-five minutes to one hour, and demonstrated standing tolerance was approximately five to ten minutes. (*Id.*) She also noted that the Plaintiff attempted to do the walk test, but terminated the test after two tries because of reported fatigue, and deferred six categories of tests due to reported dizziness and fatigue, reporting that her fatigue level was ten out of ten. (*Id*. at 425.) Ms. Pagano concluded:

> Unfortunatley [sic], since the Evaluee declined a significant portion of the testing, demonstrated a sub maximal and unreliable effort and presently has an upper respiratory infection, it is impossible to arrive at a completely accurate representation of her true functional abilities. She does demonstrate the ability to return to at least the level identified in this evaluation on a part time basis. However, because demonstrated efforts are self limited, true functional abilities are likely higher.

(*Id*.)

The Committee received the FCE and further considered Plaintiff's claim at the Committee's December 4, 2002 meeting. (*Id.* at 1.) By letter dated December 16, 2002, the Committee informed Plaintiff that

> Based on the medical information contained in your file, an independent medical evaluation of your records by [Dr. McGraw], as well as the functional capacity evaluation performed by Nutrition and Fitness Partners Forever, the Committee determined that you are able to work at a job for which you could earn a comparable wage to that which you were earning prior to the time you became disabled. Accordingly, the Committee upheld the cessation of your disability rights.

(*Id.*) The letter also informed Plaintiff of her right to bring an action pursuant to Section 502(a) of ERISA. (*Id.*)

Plaintiff subsequently commenced this lawsuit on June 29, 2004. The cross-motions for summary judgment were filed and deemed fully submitted on July 22, 2005.

II. STANDARD OF REVIEW

The summary judgment standard in this Circuit is well-established. Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 96 (2d Cir. 2007) ("This standard applies

equally to cases, like the instant one, in which both parties moved for summary judgment.") (citation omitted). The Court is to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Rivkin v. Century 21 Teran Realty LLC*, 494 F.3d 99, 103 (2d Cir. 2007). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

III. DISCUSSION

A. The "Arbitrary and Capricious" Standard

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115. The Second Circuit subsequently held that "where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility," the ultimate conclusion of the administrator is not to be disturbed unless it was "arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (internal citations omitted); *see also Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 487 (2d Cir. 2006). Under this standard of review, the Court "may overturn a plan administrator's decision to deny benefits only if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Pagan*, 52 F.3d at 442). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Id.* (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)). Thus, the scope of review is narrow and "highly deferential to a plan administrator," and "[t]he court may not upset a reasonable interpretation by the administrator." *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) (internal citations omitted); *Celardo*, 318 F.3d at 145-46.

In assessing whether the decision of the administrator was reasonable, the court "may not consider extrinsic matters but must remain within the bounds of the administrative record considered by the plan's decision-maker." *Douglas v. First Unum Life Ins. Co.*, 465 F. Supp. 2d 301, 305 (S.D.N.Y. 2006) (citing *Miller*, 72 F.3d at 1071).

"Because district courts are required to limit their review to the administrative record, it follows that, if upon review a district court concludes that the [administrator's] decision was arbitrary and capricious, it must remand to the [administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" *Miller*, 72 F.3d at 1071.

As noted above, the Bayer plan identifies Bayer as the Plan Administrator and grants Bayer the exclusive right "to make any finding of fact necessary or appropriate for any purpose under the Plans, including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plans . . . ." (Defs.' 56.1 ¶¶ 6-7.) Similarly, the Plan gives Bayer "the exclusive and discretionary right to interpret the terms and provisions of the Plans and to determine any and all questions arising under the Plans or in connection with the administration thereof . . . ." (*Id.*) This is sufficient to vest discretionary authority with Bayer. *See also McCaughan v. Bayer Corp.*, No. 04 Civ. 1401, 2007 WL 906267, at *6 (W.D. Pa. March 22, 2007) (finding that the Plan "is a typical employer-funded ERISA plan subject only to arbitrary and capricious review"); *Smith v. Bayer Corp.*, 444 F. Supp. 2d 856, 868 (E.D. Tenn. 2006) (same). The parties do not dispute that the arbitrary and capricious standard is the correct standard to be applied. (*See* Pl.'s Mem. at 11; Defs.' Mem. at 7-8.) Accordingly, the Court will apply the arbitrary and capricious standard.

B. Analysis

1. Plaintiff Bears the Burden of Proving Entitlement to Benefits

A plaintiff challenging the denial of benefits under an ERISA plan bears the burden of proving, by a preponderance of the evidence, that she is "totally disabled" within the meaning of the Plan. *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006). This is in keeping with the general tenet of insurance law that "the insured has the burden of proving that a benefit is covered." *Id.* (quoting *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002)).

To the extent that Plaintiff argues that the past payment of benefits resulted in a shifting of the burden to the Defendants (*see* Pl.'s Opp. at 16-18), Plaintiff is incorrect. There is nothing in the caselaw suggesting that the burden of proof shifts to the Defendants if the Plaintiff previously received benefits. *See Paese*, 449 F.3d at 441; *see also Lee v. Aetna Life and Cas. Ins. Co.*, No. 05 Civ. 2950 (PAC), 2007 WL 1541009, at *4 (S.D.N.Y. May 24, 2007) ("[The administrator] is not required to disprove the possibility that [plaintiff] was disabled in order to terminate her benefits; rather, it is [plaintiff's] burden to demonstrate her disability under the Plan.") (citing *Juliano v. Health Maint. Org. of N.J.*, 221 F.3d 279 (2d. Cir. 2000)); *accord Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262 (5th Cir. 2004) (holding that there is no heightened level of proof merely because the ERISA fiduciary previously approved the payment of benefits and actually paid them); *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004) ("As a result of the payment

of benefits, the plan does not incur the burden of showing a change in claimant's condition in order to justify a termination of benefits; the claimant retains the burden of proving continued disability."). The Defendants rely heavily on the rationale set forth in *Ellis* and *Hufford*, and the Court finds that rationale compelling, particularly in light of the *Paese* and *Lee* cases, decided after these motions were filed. Additionally, the Plan language itself indicates that LTD benefits under the Plan will cease when a participant is no longer disabled, or does not "provide satisfactory medical proof of [his or her] continuing disability . . . ." (Zimmerman Decl. ¶ 2(C), Ex. C at 511; Defs.' 56.1 Opp. ¶ 50.) Accordingly, the burden to demonstrate total disability by a preponderance of the evidence remains with the Plaintiff.

2. Defendants' Denial of Plaintiff's Benefits Was Neither Arbitrary Nor Capricious

The Defendants contend, and the Plaintiff does not dispute, that in reaching a decision, the Committee relied on the information contained in the administrative record in this case, which included (1) Plaintiff's own reports of her condition; (2) Medical reports and other documentation and information provided by Plaintiff's treating physician, Dr. Levine;[7] (3) an occupational demands description of Plaintiff's secretarial position at Bayer; (4) reviews of Plaintiff's medical records by Drs. Superfine and Rosenkrantz, both board-certified in internal medicine; (5) employability assessments and labor market surveys; (6) results of the independent review of Plaintiff's records by Dr. McGraw; and (7) the results of the FCE. (*See* AR at 3-78 (Final Appeal Brief submitted by Kemper to the Committee); (AR at 79-81) (McGraw review); (AR at 82-102) (FCE report); *see also* AR at 1.) The Committee considered the evidence in the record and determined that the Plaintiff was not "totally disabled" within the meaning of the Plan and that she was capable of performing at least sedentary to light work. (*Id.* at 1.)

Having carefully reviewed the administrative record, the parties' submissions, and the applicable law, the Court finds that the decision of the Committee that the Plaintiff did not meet her burden of demonstrating that she was "totally disabled" was not arbitrary and capricious, but rather, was reasonable and supported by the administrative record. *See Celardo*, 318 F.3d at 146.

---

[7] Defendants make much of the fact that Plaintiff's primary treating physician, Dr. Levine, "has had her license to practice medicine suspended in connection with fraudulent and incomplete CFS diagnoses." (*See* Defs.' Mem. at 11-14.) This has been noted by at least two courts in this district. *See Lochner v. Unum Life Ins. Co. of Am.*, No. 96 Civ. 3828 (LTS), 2002 U.S. Dist. LEXIS 3745, at *13-14 (S.D.N.Y. March 7, 2002); *Solaas v. Delta Family-Care Disability and Survivorship Plan*, No. 03 Civ. 8680 (LAP), 2005 U.S. Dist. LEXIS 5269, at *9-10 (S.D.N.Y. Mar. 29, 2005). However, as Plaintiff contends, there is no indication anywhere in the record that either Kemper or the Committee considered this information before rendering their decision to deny Plaintiff's benefits claim, and that suggestion is thus not part of the administrative record. In making a determination of whether the Committee's decision was arbitrary and capricious, a court may only consider the administrative record that was before the Committee at the time it rendered its decision. *Douglas*, 465 F. Supp. 2d at 305 (citing *Miller*, 72 F.3d at 1071). As such, the Court may not consider any information about Dr. Levine other than that contained in the record.

The Plaintiff has put forth several arguments in support of her contention that the Committee's decision was arbitrary and capricious; however, none of those arguments are availing. The Court will address each in turn.

a. The Committee's Request for Objective Evidence of Total Disability Was Not Unreasonable

Plaintiff contends that, to the extent the Committee's denial of her claim was based on Plaintiff's failure to submit adequate objective medical evidence, that decision was *prima facie* unreasonable and thus arbitrary and capricious. (Pl.'s Mem. at 12-16.) Specifically, Plaintiff contends that "since CFS is a diagnosis of exclusion," it does not lend itself to objective testing. *Id.*

The Second Circuit has not squarely addressed this issue. However, several courts in this district have found that it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits. *See, e.g.*, *Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd,* 62 Fed. App. 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003); *Lee*, 2007 WL 1541009, at *5; *Robbins v. Aetna Life Ins. Co.*, No. 03 Civ. 5792 (NGG), 2006 WL 2589359, at *10 (E.D.N.Y. Sept. 8, 2006); *Greenberg v. Unum Life Insur. Co. of Am.*, No. 03 Civ. 1396, 2006 WL 842395, at *10 (E.D.N.Y. Mar. 27, 2006); *Straehle v. INA Life Ins. Co. of New York*, 392 F. Supp. 2d 448, 459 (E.D.N.Y. 2005); *Solaas*, 2005 WL 735965, at *4; *Scannell v. Metro. Life Ins. Co.*, No. 03 Civ. 990 (SAS), 2003 WL 22722954, at *5 n.65 (S.D.N.Y. Nov. 18, 2003). This is true even in cases in which the Plaintiff has been diagnosed with CFS and/or fibromyalgia. *See, e.g.*, *Maniatty*, 218 F. Supp. 2d at 504; *Solaas*, 2005 WL 735965, at *4. In *Maniatty*, Judge Rakoff wrote:

> [T]he administrator, far from ignoring the reports of the treating physicians, heavily relied on the fact that none of them adduced any objective evidence of plaintiff's complaints. In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator. While plaintiff argues that the plan itself does not state that objective evidence is necessary to establish disability, the plan does state that "proof" of continued disability must be provided, and the very concept of proof connotes objectivity. In any event it is hardly unreasonable for the administrator to require an objective component to such proof.

*Maniatty*, 218 F. Supp. 2d at 504.

As the Defendants point out, the operative question in this case is *not* whether Plaintiff actually suffered from CFS and/or fibromyalgia, but instead whether the Plaintiff's CFS and/or fibromyalgia rendered her "totally disabled" within the definition of the Plan and thus unable to work. (*See* Defs.' Mem. at 3-4.) The distinction is an important one. *See Solaas*, 2005 WL 735965, at *4

("The question of whether the Plaintiff can return to her former job is separate from the presence or severity of her CFS."); *Kunstenaar v. Conn. Gen. Life Ins. Co.*, No. 88 Civ. 884 (JFK), 1989 WL 82450, at *2 (S.D.N.Y. July 17, 1989) ("Plaintiff confuses illness with total disability. No one is disputing the fact that [Plaintiff] was ill . . . . However, illness is not to be equated with total disability."); *see also Denmark v. Liberty Life Assurance Co. of Boston*, 481 F.3d 16, 37 (1st Cir. 2007) ("[T]his court draws a distinction between requiring objective evidence of the diagnosis, which is impermissible for a condition such as fibromyalgia that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed."); *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 401 (5th Cir. 2007) ("Here, the administrator, and the medical experts upon which it relied, understood and accepted the diagnosis of fibromyalgia; and they considered the subjective evidence [plaintiff] offered. It is true that the administrator did not accept the opinion of [plaintiff's] experts as to the disabling effects of her symptoms. However, given the three qualified medical experts who found no objective medical evidence of disability, the administrator, under the established standard of review that restricts the courts, was not obliged to accept the opinion of [plaintiff's] physicians.").

Plaintiff cites several cases that she claims stand for the proposition that requiring claimants to provide objective medical evidence of a CFS diagnosis is *prima facie* unreasonable, including one case from this district, *Sansevera v. E.I. DuPont de Nemours & Co.*, 859 F. Supp. 106 (S.D.N.Y. 1994), and several from other circuits, including *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11 (1st Cir. 2003), *Hawkins v. First Union Corp. LTD Plan*, 326 F.3d 914 (7th Cir. 2003), and *Mitchell v. Eastman Kodak*, 113 F.3d 433 (3d Cir. 1997). However, because, as discussed above, the operative question is whether the Plaintiff was "totally disabled" within the definition of the Plan and thus unable to work, the cases cited by Plaintiff are distinguishable.

First, the Plaintiff cites to *Sansevera* as support for the notion that, with regard to a claim for benefits by an individual afflicted with CFS, "it is unreasonable to demand evidence of a specific kind of impairment after experts have concluded that no definitive test for CFS has yet been discovered." *Sansevera*, 859 F. Supp. at 113. However, as noted above, *Sansevera* fails to distinguish a finding of "total disability" (the finding required in the instant case) from a diagnosis of CFS (a finding not necessary in the instant case).[8]

Plaintiff also cites *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 21 (1st

---

[8] Furthermore, there was testimony in *Sansevera* that the plan required that the claimant prove that the disability was expected to be lifelong *with medical certainty*. *Id*. at 114. Here, the plan requires that, at the present time, the claimant be "totally" disabled (as opposed to "partially" disabled), and thus "unable to work at any job for which [the claimant is] or could become qualified by education, training or experience." (Defs.' 56.1 ¶ 8.) It does not make any mention of "medical certainty," nor is there anything in the record that the Committee required Claimant to be totally and *permanently* disabled in order to be eligible for benefits. *See also Darling v. E.I. DuPont de Nemours & Co.*, 952 F. Supp. 162, 165-66 (W.D.N.Y. 1997) (distinguishing *Sansevera* on this ground).

Cir. 2003) for the proposition that "given the nature of [CFS], it was not reasonable for [the administrator] to expect [the claimant] to provide convincing 'clinical objective' evidence that she was suffering from CFS." However, the First Circuit has since clarified its holding on this point, noting that "[i]n *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003), we held that '[w]hile the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.'" *See Denmark*, 481 F.3d at 37.

Likewise, at least one court in this District has made a similar finding, stating that it is reasonable "to insist on some objective measure of claimants' capacity to work, so long as that measure is appropriate as applied to each specific condition." *Cook v. The New York Times Long-Term Disability Plan*, No. 02 Civ. 9154 (GEL), 2004 WL 203111, at *4 (S.D.N.Y. Jan. 30, 2004) (citing *Boardman*); *see also Wangenstein v. Equifax, Inc.*, 191 Fed. Appx. 905, 913 (11th Cir. 2006) (distinguishing *Mitchell* on the grounds that, unlike in *Mitchell*, the administrator in *Wangenstein* "did not simply ignore the opinions of [plaintiff's physicians], but rather placed greater reliance on the opinions of its peer reviewers, who generally cited a lack of objective evidence that [plaintiff] was disabled from performing the duties of any occupation in concluding that she had not established her entitlement to benefits.").

Moreover, there is no indication that the Committee considered *only* the lack of objective evidence provided by the Plaintiff in reaching its decision. The Committee's consideration of Plaintiff's subjective complaints is evinced by, *inter alia*, its review of the medical records and the letters submitted by Dr. Levine. Moreover, the Committee's decision to request the FCE is evidence that the Committee credited Plaintiff's subjective complaints to an extent. The benefits were terminated after a review of updated records and medical evaluations, including the FCE, which indicated that Plaintiff's subjective complaints were not substantiated by objective data. *See id; cf. Krizek v. Cigna Group Ins.*, No. 99 Civ. 1943 (NAM), 2005 WL 928637, at *5 (N.D.N.Y. Mar. 22, 2005) (weighing subjective and objective evidence and finding that, even crediting plaintiff's subjective complaints regarding pain and fatigue, plaintiff "overstated" her complaints and was still capable of performing light to sedentary work).

In short, the Committee did not "summarily discount" the opinion of Dr. Levine, as Plaintiff argues. (Pl.'s Reply Mem. at 3.) Rather, the Committee merely noted the absence of any objective evidence as a factor in its decision-making process after offering Plaintiff several opportunities to submit some objective evidence in support of her claim. Plaintiff's repeated references to additional measures the Committee *should* have taken before making a decision ignores the fact that Plaintiff bore the burden of proof by a preponderance of the evidence. *See Paese*, 449 F.3d at 441. Given Plaintiff's failure to offer sufficient objective evidence in support of her claim of disability, it cannot be said that the Committee's decision to credit some evidence over other evidence in denying Plaintiff's claim was unreasonable.

Plaintiff also contends that, even assuming *arguendo* that objective evidence was properly required by the Committee, sufficient objective evidence *was* provided to the Committee for the Plaintiff to meet her burden of demonstrating "total disability," and the Committee's decision denying benefits was thus arbitrary and capricious. (Pl.'s Mem. at 14-16.) That evidence, according to the Plaintiff, consisted of Dr. Levine's observations about the presence of "CFS linked characteristics" based on the Plaintiff's physical appearance and abilities, infection with herpes and the Epstein-Barr virus, and various observations made by Ms. Pagano from the FCE. (*See id.* at 14-15.) However, this argument is just another way of asserting that the Committee's decision was wrong. The decision as to whether the evidence cited by the Plaintiff was truly "objective," or, if it was objective, whether it was sufficient to show "total disability" was in the sole discretion of the Committee, subject only to a review by this Court of whether that decision was arbitrary and capricious. *See Pagan*, 52 F.3d at 442 (holding that a court is "not free to substitute [its] own judgment for that of the [] Committee as if [it] were considering the issue of eligibility anew."). For the reasons cited above and below, Plaintiff has not shown that the Committee's determination was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Celardo*, 318 F.3d at 146.

b. The Committee's Failure to Afford Deference to the Plaintiff's Treating Physician Was Not Unreasonable

Plaintiff also contends that the Committee's decision was "arbitrary and capricious" because the Committee failed to consult with its own expert on CFS and arbitrarily denied the opinions of the Plaintiff's treating physician, a CFS specialist, in favor of the opinions of physicians who were not CFS specialists. (Pl.'s Mem. at 16-17.) The Supreme Court has held that ERISA does not require a plan administrator to afford greater deference to the plaintiff's treating physician than that afforded to physicians retained by the administrator to review the case — provided that the evidence put forth by the claimant is not arbitrarily discredited by the administrator. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006); *Paese*, 449 F.3d at 442. In *Black & Decker*, the Supreme Court cautioned that evidence is not to be arbitrarily discredited, but held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." 538 U.S. at 823-24. Simply put, while the administrator may *choose* to give greater weight to the treating physician's findings, it is not required to do so under the arbitrary and capricious standard.[9] *Id*; *see, e.g.*, *Demirovic*, 467 F.3d at 212; *Paese*, 449 F.3d at 442; *Gannon v. Aetna Life Ins. Co.*, No. 05 Civ. 2160 (JGK), 2007 WL 2844869, at *13 (S.D.N.Y. Sept. 28, 2007);

---

[9] To the extent that Plaintiff argues that the "treating physician rule" of Social Security disability litigation applies or is analogous here (*see* Pl.'s Mem. at 18 n.2), that argument was explicitly rejected in *Black & Decker*. 538 U.S. at 825.

*Alexander v. Winthrop, Stimson, Putnam and Roberts Long Term Disability Coverage*, 497 F. Supp. 2d 429, 438 (E.D.N.Y. 2007); *Pava v. Hartford Life and Accident Ins. Co.*, No. 03 Civ. 2609 (SLT), 2005 WL 2039192, at *11 (E.D.N.Y. Aug. 24, 2005) (finding, in a case involving a plaintiff afflicted with CFS and fibromyalgia, that the administrator was not obligated to give special weight to the opinions of the treating physician); *Solaas*, 2005 WL 735965, at *5 & n.5 (same); *see also Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003) (noting that "the procedures followed by plan administrators are matters of contract. Nothing compels an ERISA plan either to adopt or to reject a treating-physician presumption."). Thus, the failure to afford deference to Dr. Levine's opinions does not demonstrate that the decision was arbitrary and capricious.

Similarly, there is no requirement that the Committee engage physicians specially trained in the diagnosis of CFS and fibromyalgia to examine the Plaintiff or the Plaintiff's records in a recovery of benefits case. (*See* Pl.'s Mem. at 16-19.) To the contrary, in similar cases involving plaintiffs afflicted with CFS and/or fibromyalgia, courts deemed it sufficient that doctors trained in internal medicine or occupational medicine were retained to review the Plaintiff's records. *See*, *e.g.*, *Lee*, 2007 WL 1541009, at *2-3 (plaintiff's records reviewed by a physician who was board-certified in internal medicine and occupational medicine); *O'Sullivan v. The Prudential Ins. Co. of Am.*, No. 00 Civ. 7915 (KNF), 2002 WL 484847, at *5 (S.D.N.Y. Mar. 29, 2002) (plaintiff's records reviewed by a physician specializing in occupational and environmental health and holding a Master's degree in Public Health). As in those cases, the physicians who were retained by the Committee to examine plaintiff's records were sufficiently qualified to judge the extent of plaintiff's disability.[10]

Moreover, as discussed above, the operative question before the Committee was whether Plaintiff was "totally disabled," *not* whether she was afflicted with CFS or fibromyalgia. In this case, while it is true that Plaintiff was not personally examined by a CFS specialist other than Dr. Levine, Plaintiff *was* personally examined in the context of the FCE, the purpose of which was to determine her physical capacity to work and the extent of her claimed disability. This examination was a sufficiently reasonable method of ascertaining the extent of Plaintiff's disability, and Plaintiff cites no authority for the proposition that the Committee was required to retain a CFS specialist in order to determine the extent of Plaintiff's disability.

Additionally, any suggestion that an administrator's physicians are *required* to conduct an in-person, physical examination of a plaintiff rather than a review of the record in a case such as this is unsupported by law. Plaintiff cites no authority for this proposition. To the contrary, courts in this district have found that an administrator's

---

[10] Dr. Superfine is a specialist in Internal Medicine and Emergency Medicine and is board-certified in both. (*See* Zimmerman Decl. ¶ 2(I), Ex. I.) Dr. Rosenkrantz is board-certified in Internal Medicine. (*Id.* at ¶ 2(J), Ex. J.) Dr. McGraw is board-certified in Occupational Medicine and has a Master's degree in Public Health, Occupational Medicine and Epidemiology. (*Id.* at ¶ 2(F), Ex. F.)

reliance on the opinions of non-examining physicians over the plaintiff's own treating physicians is not, in and of itself, arbitrary and capricious. *See Wagner v. First Unum Life Ins. Co.*, No. 02 Civ. 9135 (RLC), 2003 WL 21960997, at *5 (S.D.N.Y. Aug. 13, 2003); *Alakozai v. Allstate Ins. Co.*, No. 98 Civ. 3720 (RCC). 2000 WL 325685, at *7 (S.D.N.Y. March 28, 2000). Thus, the failure of the Committee to insist on an independent, in-person medical examination by a CFS specialist was not, in and of itself, arbitrary and capricious.

\* \* \*

The Court does not mean to suggest that Plaintiff does not suffer from CFS and/or fibromyalgia on a daily basis. Likewise, the Court does not find that the Plaintiff exaggerated or amplified her symptoms, nor does the Court find that the Committee's decision was *correct*. *See Pagan*, 52 F.3d at 442. Rather, the Court merely holds that, based on the administrative record, the decision of the Committee was not arbitrary or capricious. The Committee was required to consider Plaintiff's evidence fairly, but not necessarily to credit it over competing evidence, notably the lack of sufficient objective evidence and the fact that she gave an "unreliable effort" (AR at 424-25) when her functionality was independently and personally examined in an effort to secure objective findings. For these reasons, the Plaintiff's motion is denied and the Defendants' motion is granted.[11]

---

[11] Defendant Kemper also argues that summary judgment should be granted in favor of Kemper because Kemper is not a proper defendant pursuant to ERISA. Because the Court here grants the motion on other grounds, it need not address whether Kemper is a proper defendant for purposes of this case. Additionally, Plaintiff has moved for an award of attorneys' fees. However, "an attorney's failure to obtain relief under ERISA generally precludes an award of attorneys' fees." *Weil v. Ret. Plan Admin. Comm. of Terson Co., Inc.*, 913 F.2d 1045, 1052 (2d Cir. 1990), *vacated in part on other grounds*, 933 F.2d 106 (2d Cir. 1991). Given that Plaintiff is not the prevailing party, her motion for attorneys' fees is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that, viewing the evidence in the light most favorable to the Plaintiff, the Committee's decision to discontinue Plaintiff's disability benefits was not arbitrary and capricious. Defendants' motion for summary judgment is thus GRANTED and Plaintiff's motion for summary judgment is DENIED. The Clerk of the Court is directed to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: January 17, 2008
New York, New York

\* \* \*

Plaintiff is represented by Frank Winston, Esq., and Roman Rabinovich, Esq., Wilkofsky, Friedman, Karel, & Cummins, 299 Broadway, 17th Floor, New York, New York 10007. Defendants are represented by Scott M. Zimmerman, Esq., and Steven J. Loewenthal, Esq., Heidell, Pittoni, Murphy & Bach, LLP, 99 Park Avenue, New York, New York 10016.